fact so treat the contract, and did not in fact consider that time should be of the essence of the contract.

We believe that the facts in the case at bar show that the defendant Mrs. Bott lulled the complainant into a position of false security, and that she should not be permitted to declare a forfeiture, without giving the complainant a reasonable time to perform, as Mrs. Bott evidently unlawfully endeavored to do.

The decree below will be reversed, with costs, and the record remitted to the end that a decree for specific performance be entered.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, JJ. 13.

WILLIAM SICK, as next friend of Marie Sick, complainant-respondent,

*v.*

CHARLES C. WEIGAND, defendant-appellant.

[Decided January 26th, 1938.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Lewis, who filed the following opinion:

"The bill filed in this matter seeks to impress a trust on certain real estate and personal property in the hands of the defendant by reason of a certain agreement between Marie Louise Haskins and her husband, John V. Haskins, both now deceased. Complainant, Marie Sick, is a niece of Marie Louise Haskins, defendant, Charles Weigand, is a cousin of John V. Haskins.

"From the testimony presented at the final hearing, I find the followings facts: John V. Haskins and his wife, Marie Louise Haskins, lived at 420 Passaic street, Hackensack, in a home free and clear of liens and among furnishings which were objects of art, fine rugs, jewelry, and so forth. Both suffered from cancer. The wife was apparently stricken first and became bedridden after her right leg was amputated and on April 11th, 1935, Mrs. Augusta E. Maley, a friend, and a solicitor and counselor of this court, was summoned to the home and requested by Mrs. Haskins to draw her will. It is apparent that Mrs. Haskins controlled the finances of the family and was worried about what might happen to her husband when she was gone. She, at that time, had been informed by physicians attending her husband that he, too, had cancer and she feared that a knowledge of it by him would aggravate the situation; at the same time she desired him to be as comfortable as their circumstances would permit. Mrs. Haskins indicated to Mrs. Maley a wish to provide for her niece, the complainant here. After some discussion, it was agreed by Mrs. Haskins, upon the advice of Mrs. Maley, that the course to pursue was to invest Mr. Haskins with a life estate with the remainder to the complainant. Before any attempt was made to draft a will, Mrs. Haskins had her husband summoned to the room and made known to him her intentions. He became very much exorcised and left the room and went downstairs. This action worried Mrs. Haskins and she asked Mrs. Maley to outline some other course that would bring about the same results. Mrs. Maley advised her that she and her husband could make concurrent wills and that Mrs. Haskins might be assured by her husband's statement that he would not, in his lifetime, change his will

or dispose of the real estate or personal property otherwise than provided in the mutual wills, unless it became absolutely necessary by reason of his inability to meet the carrying charges on the property or in the event he needed additional funds for medical expenses, Mrs. Haskins then knowing, as I have indicated, that her husband had cancer. Mr. Haskins was then recalled to the room, a pact was made along the lines suggested, and Mrs. Maley departed and drew the wills. She returned on the following afternoon, the oral pact was reiterated and the wills executed. Mrs. Maley departed taking the executed wills with her. The following day Mrs. Haskins died.

"Shortly after the funeral, Mr. Haskins went to Atlantic City. After a week or ten days, he summoned the defendant by letter to drive him back to Hackensack, sending him with the letter $10 for expenses and the keys to his automobile which was then garaged at Hackensack. Upon their return, they lived at the homestead on Passaic street for a short time when Haskins went to the Hackensack Hospital for observation and treatment. He often left the hospital during the day with the defendant, but Mr. Haskins always returned to the hospital to sleep, defendant returning to the homestead. On May 28th, while Haskins was confined to the hospital, he summoned an employe of the office of Hart & Vanderwart, where present counsel for the defendant was then employed. She went to the hospital during her lunch hour as she testified and found that Haskins desired to make a will. She took notes of his wishes and returned to the office and gave the information to counsel. He drafted the will and returned with the employe of the office to the hospital after office hours and the will was executed by Haskins. Subsequently, Mrs. Maley learned of the execution of the second will and thereupon notified Mr. Haskins that the will was invalid by reason of the previously executed will and oral pact.

"Haskins, according to the testimony of the defendant, had told him that he intended to compensate him for staying with him, caring for him and being a companion to him, thus, when the defendant, too, learned that the will was invalid,

he visited counsel. Either shortly before this visit or shortly after, Haskins, too, had visited counsel and informed him of the situation. Counsel made an investigation and reported that in his opinion the will was invalid. Upon a request from Mr. Haskins as to what he could do in order to dispose of the property other than he had agreed, counsel advised him that while he could make no testamentary disposition of the property, he could convey it or give it in his lifetime to anyone he desired. Haskins then advised counsel he desired to give it to Mr. Weigand. Counsel, by his own admission, knew at this time of the existence of the concurrent wills and knew from conversations with Mr. Haskins and Mrs. Maley that Mrs. Maley was the scrivener of them. Counsel, in his testimony, says that he knew Mr. Haskins was seventy-two or seventy-three years of age, that he was a little suspicious of the transactions and asked Mr. Haskins if there was any contemporary oral agreement made at the execution of the concurrent wills, and that under all these peculiar circumstances, in order to protect himself he asked one of the employes of the office, a Mrs. Ford, to act as a witness to Haskins' request that he draw a deed and bill of sale for all of his property to Mr. Weigand. He also states that he had Mr. Haskins make an affidavit. Counsel did not, however, at any time ask Mrs. Maley if there had been concurrent oral agreement made at the time of the execution of the mutual wills. A bill of sale and deed were executed in the latter part of July or early part of August from Haskins to Weigand. Shortly thereafter, Haskins became bedridden as a result of the dreadful disease from which he suffered and he died on October 19th, 1935.

"William Sick, on behalf of his daughter, consulted counsel, not present counsel, and becoming dissatisfied with the progress or lack of progress that was being made in the matter, consulted Mr. Peraino and the bill was filed.

"Mrs. Maley, a reliable practitioner before this court for many years, testified fully concerning the transactions between Mr. and Mrs. Haskins and her testimony is not contradicted. I am satisfied from her testimony that Mrs. Haskins exacted

from her husband a promise to devise and bequeath so much of the estate as remained unexpended by him at the time of his death, to the complainant, as a result of which she gave him a free hand in the administration of the estate during his lifetime, and refrained from giving him a mere life estate.

"At the trial there was an effort on the part of the defendant to indicate that Mrs. Haskins could not have exercised control over the estate by reason of the fact it had been accumulated by her husband. Mr. Wadsworth, an old friend and business associate of Mr. Haskins, said that 'Jack' Haskins had made some money during his lifetime but 'Mrs. Haskins prevailed upon him to quit work because she had money enough to take care of both of them.' There was other evidence to indicate that at one time Haskins had been in the jewelry business and there was inferences to be drawn that he had given his wife quite some jewelry. At the close of the testimony leave was asked to submit in evidence a copy of the will of Mrs. Haskins' father, the complainant contending that the major share of her estate came from him. By consent of counsel this will was admitted at the time the briefs were submitted. A perusal of this will clearly indicates the wife was the moneyed member of the family and this tends to corroborate the complainant's testimony. By the terms of her father's will Mrs. Haskins received the house in which he resided at 153 West Ninety-second street, New York City, together with all of the contents including the works of art, jewelry, furnishings and so forth; she also received the house in which she and her husband resided at 420 Passaic street, Hackensack, a house and lot at Eighty-seventh street and First avenue, New York City, and the proceeds of all his life insurance aggregating approximately $10,000.

"From a factual standpoint unquestionably the complainant is entitled to a decree.

"And an examination of the cases in this state on the subject clearly indicate that the complainant is entitled to a decree. In the early case of *Williams* v. *Vreeland, 32 N. J. Eq. 135; affirmed, Ibid. 734,* it was held that:

" 'Where a testator makes a will or omits to alter it on the promise of a beneficiary that he will make certain disposition of the property bequeathed, or some part thereof, equity will declare the beneficiary a trustee for the performance of his promise to prevent the statute of wills being used as an instrument of fraud.'

"In the same case the court in essence said that the trust owes its validity to the fraud of the devisee. This same case was cited with approval together with a long line of cases in *Nash* v. *Bremner, 84 N. J. Eq. 131,* where the court used almost the same language in declaring that:

" 'The rule is that, where a testator makes his will or omits to alter it on the promise of a beneficiary that he will make certain disposition of the property bequeathed, or some part thereof, equity will declare the beneficiary a trustee for the performance of his promise to prevent the statute of wills being used as an instrument of fraud.'

"A decree will be advised for the complainant."

*Mr. Charles Jones,* for the appellant.

*Mr. Ambrose J. Peraino,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion of Vice-Chancellor Lewis in the court of chancery.

*For affirmance*—PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, HETFIELD, DEAR, WELLS, WOLFSKEIL, RAFFERTY, WALKER, JJ. 13.

*For reversal*—None.